IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

IN RE:                              )
                                    )
DONALD E. HAMMED and                )
                                    )
JENIFER DOSS HAMMED,                )       Case No. 04-53282
                                    )
            Debtors.                )
                                    )

ENTERED
APR 2 2 2005
U.S. BANKRUPTCY COURT
MDNC - TD

## MEMORANDUM OPINION

On December 13, 2004, the United States Bankruptcy Administrator (the "Bankruptcy Administrator") filed a motion to dismiss the Chapter 7 bankruptcy case of Donald and Jenifer Hammed (the "Debtors") for substantial abuse of the Bankruptcy Code under 11 U.S.C. § 707(b). The Court held a hearing on this matter on April 15, 2005, and took the matter under advisement. After consideration of the motion to dismiss, the evidence presented at the hearing, the arguments of the parties, and the relevant law, the Court will deny the Bankruptcy Administrator's motion to dismiss the Debtors' case.

## I.    BACKGROUND

On November 8, 2004, the Debtors filed their Chapter 7 bankruptcy petition. The Debtors listed primarily consumer debts in their schedules, mostly consisting of unsecured indebtedness of $57,505.57, two mortgages totaling $252,532.66, and two vehicle liens totaling $46,054.12. As of the date of the petition, the male Debtor was employed as the vice president of Hinkles, an office supply/furniture business, earning a net monthly income of $5,500.00.[1] The

---

[1] The male Debtor nets $5,107.72 per month from his employer. The Debtors testified that they typically receive a tax refund of approximately $8,000.00 per year. Adding an estimated monthly amount from tax refunds, the Chapter 13 Trustee established the Debtors'

Debtors have three minor children, ages 12, 10, and 8, and the female Debtor does not currently work outside the home.

The Debtors' Schedule J showed monthly expenses of $4,727.00. After meeting with the Chapter 13 Trustee and reassessing their actual monthly expenses, the Debtors filed an Amended Schedule J showing monthly expenditures of $5,475.36,[2] consisting primarily of a $1,740.27 mortgage payment, $800.00 car payments[3], and $300.00 in medical expenses. The Court believes that Amended Schedule J more accurately reflects the Debtors' monthly expenditures.

According to the male Debtor's testimony, the Debtors' eventual bankruptcy was mainly the result of credit card debt that accumulated over the span of several years with the Debtors paying one credit card bill with another credit card and attempting to make larger payments on higher interest credit cards when the Debtors received their annual income tax refund. This cycle of debt spiraled out of control long before the Debtors filed their petition. The male Debtor testified that he had only been able to make minimum monthly payments on the credit cards for years.[4] The male Debtor testified that the original credit card charges were the result of paying living expenses[5] with credit cards. The Debtors did not make luxury purchases with the credit

---

actual monthly income to be $5,657.00.

[2]The Chapter 13 Trustee calculated the Debtors' actual monthly expenditures, including the actual car payment of $997.00, to be $5,672.00.

[3]The actual amount the Debtors' spend per month on vehicles is $997.00.

[4]The credit card debt was not recently incurred debt; it accumulated over several years. The Debtors were not incurring new debts on their credit cards within the year preceding their bankruptcy filing. The credit card debt was increasing due to the Debtors' attempts to make payments on one credit card with another credit card.

[5]Examples given include groceries, gasoline, and other daily living essentials.

2

cards.

The Debtors attempted to manage their credit card debt in numerous ways outside of bankruptcy. The Debtors incurred a second mortgage on their home in October of 2000 in the amount of $35,000.00, of which they used $25,000.00 to pay off a previous equity line, and $10,000.00 to pay on credit card bills.[6] The male Debtor testified that they routinely used their annual tax refunds to pay balances on their credit cards with the highest interest rates. In 2002, the male Debtor cashed out his 401k retirement plan in the amount of $30,000.00, with which the Debtors paid down their credit card debt. The female Debtor received an inheritance in 2002 in the amount of $30,415.00, which the Debtors used to pay current bills and credit card debt. Finally, in 2004, the Debtors borrowed $8,800.00 from the female Debtor's father, which they used to pay down credit card debt.

The family's income decreased when the female Debtor left the workforce in December of 1999. The female Debtor was employed as a preschool teacher at High Point Christian Academy from August to December of 1999. She was forced to leave her employment because of medical complications. The female Debtor suffers from ulcerative colitis, a chronic disease characterized by abdominal pain, rectal bleeding, and frequent diarrhea. The female Debtor testified that she was diagnosed with ulcerative colitis in 1998 but that she had suffered from symptoms of it long before her diagnosis. The female Debtor testified that her symptoms worsen with increased stress and that it was aggravated by her job demands at the preschool. She testified that there are occasions where her condition is so inflamed that she cannot leave her house. In order to try to minimize her symptoms, the female Debtor takes more than one daily

---

[6]The previous equity line of $25,000.00 was used to pay toward credit card debt.

medication and must give herself a maintenance enema every night or every other night. She further testified that she typically has a flare up of her symptoms at least once a month, sometimes more often. The Court is satisfied that her condition is severe and effectively prevents her from being employed outside the home.

The male Debtor also suffers from some medical complications related to his heart, blood pressure, and sleep apnea, and he takes three prescription medications daily.

The female Debtor home schools the Debtors' three minor children, which she began doing in 2001. She testified that she believes that home schooling the children is "significantly less expensive" than the expenses that the Debtors would pay if their children were in public school. The female Debtor testified that the home school expenses are mainly from the purchase of text books, and that she is able to negate or minimize many of those expenses by using the public library and/or by purchasing used books.

The Debtors testified that they have each recently attended a thirteen-week financial planning/management seminar. Further, they testified that they no longer have any credit cards and that, since the filing of the petition, they are functioning solely on a cash budget.

## II.    DISCUSSION

The Bankruptcy Administrator alleges that the Debtors are substantially abusing the Bankruptcy Code on the basis that the filing of their petition is an attempt to take unfair advantage of their creditors. The primary grounds for the Bankruptcy Administrator's allegation are that the Debtors' schedules are inaccurate, that the Debtors incurred debt beyond their ability to pay, and that the Debtors' unsecured creditors should not suffer because the Debtors insist on keeping a home that the Bankruptcy Administrator asserts is too expensive for them.

4

Section 707(b) of the Bankruptcy Code provides that the Court may dismiss a case filed by a Chapter 7 debtor whose debts are primarily consumer debts, if the Court finds that granting the debtor relief would be a substantial abuse of the Bankruptcy Code. 11 U.S.C. § 707(b). The burden of proving substantial abuse rests on the moving party. In re Vansickel, 309 B.R. 189, 213 (Bankr. E.D. Va. 2003). Moreover, there is a statutory presumption in favor of granting the relief requested by the debtor in determining whether to dismiss a case. 11 U.S.C. § 707(b). As the leading treatise on bankruptcy states:

> [T]he statutory presumption is obviously meant to be something more than simply a rule about the burden of proof, since that burden would already have been on the party seeking to dismiss the case. . . . It appears that the presumption is an indication that in deciding the issue, the court should give the benefit of any doubt to the debtor and dismiss a case only when a substantial abuse is clearly present.

6 Collier on Bankruptcy ¶ 707.04[5][a], p. 707-27 to 707-28 (Alan N. Resnick & Henry J. Sommer, eds., 15th rev. ed. Matthew Bender 2004). See also Harris v. United States Trustee (In re Harris), 279 B.R. 254, 259 (B.A.P. 9th Cir. 2002)(noting that the lack of clarity in the statute was akin to inspired tergiversation and concluding that the burden of proof necessary to overcome the presumption was not "clear abuse," but was one of "substantial abuse" as stated in the statute).

Abuse of the Bankruptcy Code occurs under 11 U.S.C. § 707(b) when a debtor attempts to use the provisions of the Code to get a "head start" rather than a "fresh start." Green v. Staples (In re Green), 934 F.2d 568, 570 (4th Cir. 1991)(providing that Section 707(b) allows "a bankruptcy court to deal equitably with the situation in which an unscrupulous debtor seeks to gain the court's assistance in a scheme to take unfair advantage of his creditors."); In re Schmonsees, No. 01-10844, 2001 Bankr. LEXIS 1896 at *5 (Bankr. M.D.N.C. 2001)("Section

5

707(b) should be applied in a manner in which a truly needy debtor is allowed a fresh start, while

denying a head start to the abusers."). In the Fourth Circuit, a "totality of the circumstances" test

is used in making a determination of substantial abuse under Section 707(b) because it is

consonant with Congressional intent to punish the abusers of the Bankruptcy Code and with the

statutory presumption in favor of granting the relief requested by a debtor. Green, 934 F.2d at

573. Some of the relevant factors to be evaluated in the "totality of the circumstances" approach

include:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity,
> disability, or unemployment;
> (2) Whether the debtor incurred cash advances and made consumer purchases far
> in excess of his ability to repay;
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
> (4) Whether the debtor's schedules and statement of current income and expenses
> reasonably and accurately reflect the true financial condition; and
> (5) Whether the petition was filed in good faith.

Id. at 572 (citations omitted). The Fourth Circuit also stated "that the majority of the cases hold

that the debtor's ability to repay is the primary factor to be considered." Id.

### 1.   Illness, Calamity, Disability, or Unemployment

While the Bankruptcy Administrator does not contend that the Debtors' bankruptcy filing

was made in the absence of any illness, calamity, disability, or unemployment, the Debtors

presented substantial evidence that illness and disability affect their monthly budget and prevent

the female Debtor from working outside the home.

While the Debtors' bankruptcy filing was not due to sudden illness, calamity, disability,

or unemployment, serious medical issues certainly exist that contribute to the Debtors' decision

to file bankruptcy. The female Debtor suffers from a serious chronic disease, which will require

6

future medical expenses in the form of monthly prescriptions as well as ongoing medical checkups, tests, and possible surgeries.  The male Debtor suffers from high blood pressure and recently underwent medical tests related to his heart.  The male Debtor takes three prescription medications for his conditions.

### 2.    Cash Advances and Consumer Purchases in Excess of Ability to Repay

The Bankruptcy Administrator contends that the Debtors incurred approximately $57,505.57 in unsecured debt when the Debtors did not have any reasonable expectation that they would be able to repay it.

Incurring indebtedness without any reasonable expectation of being able to repay it is a factor for a court to consider when determining if a debtor is attempting to substantially abuse the Bankruptcy Code, but a court should not so broadly interpret this factor to foreclose the availability of Chapter 7 relief to nearly all consumer debtors; rather, a debtor's ability to repay consumer purchases and cash advances should be interpreted in a manner consistent with the Debtor's reasonable expectations of repayment at the time that the debt was incurred.  Vansickel, 309 B.R. at 211.  Indeed, nearly all debtors in bankruptcy have incurred obligations in excess of their ability to repay, and the bankruptcy court is mandated to adhere to the statutory presumption that a debtor is entitled to the relief originally sought.  11 U.S.C. § 707(b).  Taken in its proper context, a court should examine the nature of the debts incurred, if the debts were consistent with the debtor's financial status, and whether there was an unexplained change in spending patterns – all of which must be considered in light of whether a debtor is taking unfair advantage of creditors.  Vansickel, 309 B.R. at 211.

The Debtors' total unsecured debt in this case is $57,505.57, and they have secured

7

indebtedness on their house, household goods, and vehicles of $309,706.00, for a combined total of $367,211.57. In light of the total income of the Debtors over the past few years, this amount may appear excessive. The male Debtor expects to earn $85,000.00 in income for 2005, which is approximately the same as his annual income for 2004. He routinely earns approximately $85,000 per year.[7] However, the majority of the Debtors' credit card purchases are old debts from several years ago, not recently incurred debt, and they were certainly not incurred for purchases of luxury goods. Further, the Debtors encumbered their home with a second mortgage to pay down their credit card debt. During the last several years, the Debtors have struggled to manage and pay their credit card debts by making continued monthly payments on the credit cards and applying any unexpected or extra funds received toward payment on higher interest cards. The credit card debt grew beyond the Debtors' means to repay it over a period of several years, not from purchases made during the year proceeding the bankruptcy filing. Accordingly, the Debtors' inability to pay for their consumer purchases do not appear to be flagrant, and in fact, the Debtors attempted to pay their credit card debts using any and all means available to them, including the female Debtor's inheritance and a loan from the female Debtor's father. The Debtors harbored a reasonable expectation that they would be able to repay their debts as they had been doing during previous years.

### 3.    Excessive or Unreasonable Family Budget

Apart from the Debtor's mortgage expense, there is little dispute between the parties that

---

[7]In 2003, the male Debtor received income of $86,041.00.

8

the Debtors' budget on Amended Schedule J is reasonable.[8]  The Bankruptcy Administrator

argues, however, that the mortgage payment alone renders the Debtors' bankruptcy filing a

substantial abuse of the Bankruptcy Code on the basis that the Debtors ought not to spend

$1,740.00 in monthly mortgage installments while the unsecured creditors stand to gain little, if

anything.

      A debtor's budget may be unreasonable or excessive based on a high mortgage payment.

See, e.g., Shaw v. United States Bankr. Adm'r (In re Shaw), 310 B.R. 538, 541 (M.D.N.C.

2004)(finding that the debtors earned $7,804.11 in net monthly income and that a mortgage

payment of $3,349.00 on a $415,000.00 house was unreasonable in that it manifested a desire to

hold on to a station in life that seemed to precipitate the bankruptcy in the first place);

Schmonsees, 2001 Bankr. LEXIS 1896 at *12-13 (holding that mortgage payments of $2,450.00

on a $290,000.00 four-bedroom home in an upscale neighborhood occupied by two people was

excessive when the debtor and his non-filing spouse earned a net pay of $5,400.00 per month); In

re Engskow, 247 B.R. 314, 317 (Bankr. M.D. Fla. 2000)(stating that mortgage, taxes, and

insurance expenses of $2,184.53 were excessive when the debtor's net monthly income was

$3,548.40 and when the debtor did not include the income of his spouse on the schedules);

United States Trustee v. Duncan (In re Duncan), 201 B.R. 889, 896 (Bankr. W.D. Pa.

1996)(finding a mortgage and utility expenses consuming 89% of the household budget was

unreasonable and unconscionable, considering the debtor was attempting to wipe out nearly

$224,000.00 in unsecured indebtedness); cf. Vansickel, 309 B.R. at 199-200 (finding that

---

[8]There was some discussion regarding the expenses that the Debtors incur for the care of
their four dogs.  However, the Court is satisfied that the expenses are reasonable and do not merit
further discussion.

$2,300.00 per month in rent was not excessive for a family of four in a three-bedroom townhouse when the debtor's net income was $5,287.00 per month).  In considering whether a housing expense is excessive, due regard should be given to the size of the family, their reasonable needs, and the cost of alternative housing.  Furthermore, a court should not unduly depreciate a debtor's long-standing, traditional ties to a homestead.  See, e.g., 11 U.S.C. § 524(d)(2)(providing that a court is not required to ascertain whether a reaffirmation of a consumer debt secured by the debtor's real property would result in an undue hardship on a debtor or whether it would be in the debtor's best interest).

        In this case, the Debtors purchased their home in 1998 and have been able to manage their mortgage payments for several years.  The home has four bedrooms and three baths.  The Debtors testified that they need this size of a home to accommodate themselves and their three minor children.  The Court does not find this unreasonable.  The Chapter 13 Trustee reviewed the mortgage payment and determined that $1,740.00 was above average and that $1,500.00 would be a more reasonable payment.  However, there are other considerations regarding the house.  Replacement costs would likely be as much or higher than their current mortgage given that the Debtors have no equity in the property.  If the Debtors were able to purchase a similar sized house, then they would have no down payment and would undoubtedly be forced to pay a higher interest rate than their current rate of 5.3% because their bankruptcy.   Further, the Debtors receive a large annual tax refund based mainly on the fact that they pay a large amount of annual interest on their mortgages.  The $8,000.00 average annual tax refund more than offsets the additional $240.00 that the Debtors pay each month above the more reasonable figure of $1,500.00 per month.  Additionally, the Debtors have a second mortgage because they converted

10

unsecured credit card debt into a secured lien on their house. The $175.00 monthly payment on the second mortgage would be nonexistent if the Debtors had not taken out a second mortgage with which to pay unsecured creditors. As it stands, the monthly mortgage payment of $1,740.00 is approximately 31% of the Debtors' monthly income. Paying one-third of one's income toward housing expenses is not unreasonable. The Court is convinced that the Debtors did not inflate their homestead costs in an effort to live an indulgent and luxurious lifestyle at the expense of their unsecured creditors.

### 4.    Accuracy of the Debtors' Schedules

The Bankruptcy Administrator cites several inconsistencies in the Debtors' schedules as evidence of the Debtors' abuse in filing their chapter 7 bankruptcy. Taken as a whole, the Bankruptcy Administrator contends that the Debtors' errors and omissions are too contrived and weigh in favor of dismissing the Debtors' case for substantial abuse.

The importance of having a debtor submit complete and accurate bankruptcy schedules is paramount; the bankruptcy system relies heavily on self-reporting by debtors. Mertz v. Rott (In re Mertz), 955 F.2d 596, 598 (8th Cir. 1992)("[T]he petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts."); In re Fauntleroy, 311 B.R. 730, 738 (Bankr. E.D.N.C. 2004) (emphasizing that the schedules and statement of current income and expenses are to reasonably and accurately reflect the debtor's true financial condition). "Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987). Innocent mistakes in the form of a few minor omissions or errors might be forgiven; but multiple

11

inaccuracies evidence "'a pattern of reckless and cavalier disregard for the truth'" and can lead to a finding that a bankruptcy petition was filed with fraudulent intent. <u>Dean v. McDow (In re Dean)</u>, 299 B.R. 133, 140 (E.D. Va. 2003)(Section 727(d)(1) revocation of discharge proceeding)(citation omitted). Any amendment that a debtor makes to Schedules I and J subsequent to a motion to dismiss under 11 U.S.C. § 707(b) is viewed with inherent suspicion. <u>In re Gullett</u>, No. 03-10995, 2004 Bankr. LEXIS 1696 at *11 (Bankr. E.D. Ky. 2004); <u>In re Lee</u>, 162 B.R. 31, 43 (Bankr. N.D. Ga. 1993).

Here, the Debtors have two material inaccuracies on their schedules. First, in their Amended Schedule J, the Debtors listed their monthly car payment expenses to be $800.00. The actual amount per month the Debtors spend on car payments is $997.00. The reason for this inaccuracy is unclear. Second, the Debtors failed to schedule a debt in the amount of $8,800.00 that the Debtors owed to the female Debtor's father on the date of the petition.[9] The male Debtor testified that they purposefully did not list this debt on the petition because they did not want the female Debtor's father to know that they had filed bankruptcy. He further testified that the Debtors had planned to use their income tax refund from 2004 to pay off the debt. While the Bankruptcy Code mandates that debtors schedule all their debts on the date of their petition, the Court can understand why the Debtors did not want the female Debtor's father to know that they were unable to manage their finances after he lent them the $8,800.00. The Debtors failed to list the debt as a matter of pride, not in any attempt to conceal the information from the Court or from creditors.

---

[9]The male Debtor testified that the Debtors borrowed $8,800.00 from his father-in-law in April of 2004 in an attempt to pay down their credit card debt and move toward a cash-only budget.

While there are other errors in the Debtors' schedules, the errors are minor and do not rise to the level of seriousness necessary to affect a determination of substantial abuse of the Bankruptcy Code.

### 5.    Good Faith

The Bankruptcy Administrator argues that the Debtors did not file their bankruptcy in good faith mainly because the Debtors continue to live in a house with a $1,740.00 monthly mortgage payment while their unsecured creditors receive little, if anything.

An analysis of whether a petition was filed in good faith – for purposes of an 11 U.S.C. § 707(b) motion – concerns whether a debtor is misusing the bankruptcy process to achieve some illicit purpose.  Kestell v. Kestell (In re Kestell), 99 F.3d 146, 149-50 (4th Cir. 1996)(finding a "substantial abuse of the Bankruptcy Code when the debtor filed solely to discharge obligations owed to his former spouse – not any other creditor – because favoritism among creditors is antithetical to the bankruptcy process and the Bankruptcy Code is not to be used as a method of advancing personal antagonisms against an ex-spouse).  "Good faith" is defined as "a state of mind consisting in (1) honesty in belief or purpose, . . . or (4) absence of intent to defraud or seek unconscionable advantage."  Black's Law Dictionary 713 (8th ed. 2004).  See also Stewart v. United States Trustee (In re Stewart), 175 F.3d 796, 810 (10th Cir. 1999)(finding that a physician's opting for a lower paying job, disregarding his family support obligations, and buying a $26,000 vehicle instead of paying for those expenses – among other things – was sufficiently analogous to the old adage of "having your cake and eating it too" so as to call into question the debtor's good faith); In re Dominguez, 166 B.R. 66, 69 (Bankr. E.D.N.C. 1994)("Presumably, "good faith" [within the meaning of Section 707(b)] means subjective good faith.").

13

In this matter, the Bankruptcy Administrator has failed to demonstrate <u>any</u> bad faith on the part of the Debtors. The Bankruptcy Administrator has shown no practice of running up insurmountable debts in contemplation of bankruptcy, no dishonesty toward or intent to defraud creditors, or any other unconscionable advantage that the Debtors seek to gain through their bankruptcy. As discussed above, the Court does not consider the Debtors' housing costs excessive based on the circumstances of this case, and the mere fact that unsecured creditors are left unpaid after a bankruptcy filing is an insufficient basis for finding a lack of good faith. More succinctly, the Debtors are honest debtors in need of a "fresh start."

### 6. Ability to Repay Debts

The Bankruptcy Administrator asserted that if the Debtors obtained more affordable housing, then the Debtors would be able to repay some of their debts. The Bankruptcy Administrator did not attempt to reduce any other significant items in the Debtors' budget, and by the Bankruptcy Administrator's own arguments, the Debtors do not have the ability to repay their debts.[10] The amount that the Debtors have each month to repay prepetition creditors ranges from $263.00 per month (the Chapter 13 Trustee's calculation) to $311.00 per month (the amount calculated by the Court during the hearing).[11] Regardless of which figure one uses, the Debtors do not have any meaningful ability to repay their creditors in a Chapter 13.

An appropriate method of evaluating whether a debtor has the ability to repay debts is to determine what amount of that indebtedness could be repaid in a hypothetical Chapter 13 plan.

---

[10]The Bankruptcy Administrator argues that the Debtors have insufficient income to even pay their current living expenses, including the mortgages on their house.

[11]When the actual amount of the Debtors' monthly car payment is used ($997.00 rather than $800.00), the amount available to pay creditors is even less.

14

See, e.g., Shaw, 310 B.R. at 541 ("In contrast with the second factor of the 'totality of the circumstances' test, where 'ability to repay' analyzes the debtor's historical ability to repay debts, 'ability to repay' in this context analyzes the degree to which the debtor could pay creditors a significant portion of the debt under a Chapter 13 plan.").  Although a number of courts have considered the percentage of total indebtedness that could be repaid through a hypothetical Chapter 13 plan, there is no bright line test.  As stated by one bankruptcy judge:

> While it may be true that the higher the percentage of debt a Debtor could pay with future earnings, the more likely it is that a court would find substantial abuse, the converse is not true. Otherwise debtors would be rewarded for having more debt, rather than less. Instead of the percentage of debt, the determination of a debtor's ability to fund a Chapter 13 plan is based on a consideration of the debtor's ability to make a substantial effort in repaying his or her debts.

In re Praleikas, 248 B.R. 140, 145 (Bankr. W.D. Mo. 2000).

Having found that the Debtors' housing expense in this case is not unreasonable or excessive based on their particular circumstances, and considering that even with the Debtors' highest estimated monthly budget surplus they would still be unable to pay any significant amount to unsecured creditors in a Chapter 13 case,[12] the Court does not believe that the Debtors have the ability to make a substantial effort to repay their debts.

### III.    CONCLUSION

After weighing the totality of the circumstances surrounding the Debtors' bankruptcy filing, the Court finds that the errors and omissions in the Debtors' schedules are insufficient to support a conclusion that the Debtors' case constitutes a "substantial abuse" of the Bankruptcy

---

[12]Assuming a lower $800.00 monthly payment for vehicles rather than the $997.00 actual payment, the Chapter 13 Trustee estimated that the Debtors could repay 10% of their unsecured creditors in a Chapter 13 case.

15

Code within the meaning of 11 U.S.C. § 707(b).

This opinion constitutes the Court's findings of fact and conclusions of law.  A separate

order shall be entered pursuant to Fed. R. Bankr. P. 9021.

This the 22 day of April, 2005.


THOMAS W. WALDREP, JR.
United States Bankruptcy Judge

16